## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

TATIANA CUENCA-VIDARTE
Calle 47 vis #4027
Palmira, Colombia

-and-

SANDRA PETERS
(Née Guzman-Reyes)
22777 Club Hollow Rd.
Dickerson, MD 20842
(Montgomery County)

      Plaintiffs,

v.                         Civil Action No.:

MICHAELE C. SAMUEL
8200 Student Drive
Clinton, MD 20735
(Prince George's County)

-and-

ADAM ISHAEIK
8200 Student Drive
Clinton, MD 20735
(Prince George's County)

-and-

AUPAIRCARE INC.
600 California Street, Floor 10
San Francisco, California 94108

-and-

INTERNATIONAL TRAINING AND EXCHANGE, INC.
D/B/A INTRAX D/B/A AUPAIRCARE
600 California Street, Floor 10
San Francisco, California 94108

-and-

JOHN F. WILHELM
600 California Street, Floor 10
San Francisco, California 94108

-and-

TAKESHI YOKOTA
600 California Street, Floor 10
San Francisco, California 94108

      Defendants.

**-o0o-**

## PLAINTIFFS' COMPLAINT

Plaintiffs, by and through undersigned counsel, allege as follows:

## INTRODUCTORY STATEMENT

1.     Plaintiffs in this action are two migrant workers who each left their homes and families abroad to come to the United States to work as J-1 *au pairs* for the Defendants. The Defendants utilized the false promises of fair treatment, and the opportunity to live and work lawfully in the United States in order to entice the Plaintiffs to leave their homes to become *au pairs*. Once in the United States, the Defendants used coercion and threats to subject the Plaintiffs to wage theft, threats of serious harm, and forced labor. The Defendants used a variety of offensive and unlawful tactics, including psychological and emotional abuse, abuse of legal process, isolation and segregation, and threats of deportation and reputational harm, in order to control the Plaintiffs' actions.

2.      The Plaintiffs are survivors of human trafficking who worked in the home of Defendants Michaele C. Samuel and Adam Ishaeik ("the Samuel family" or "Samuel Defendants") in Maryland. Plaintiffs incurred significant expenses in order to participate in the J-1 visa program on the promises of being able to learn English and experience American life and culture while being an integral part of an American family. Instead, Plaintiffs were subjected to routine cruelty and threats of serious harm. While working for the Defendants, the Plaintiffs were not treated as members of any family; rather, they were overworked, underpaid, and severely abused.

3.      During their work in the Samuel family's home, the Samuel Defendants abused Plaintiffs verbally and emotionally, routinely threatening deportation and malicious abuse of the J-1 program if Plaintiffs failed to continue working excessively long hours as demanded by Defendants. Plaintiffs were not allowed to eat certain foods, occupy certain spaces in the house, travel outside the home, or interact with certain people. The Samuel Defendants routinely screamed at the Plaintiffs that they were "dirty." The Defendants made near constant threats of deportation in order to force Plaintiffs to work longer and harder.  Defendants also made explicit threats that they would make false allegations of sexual abuse against the Plaintiffs in order to ensure the Plaintiffs' continued labor.

4.      Plaintiff Cuenca-Vidarte was recruited to work in the United States by AuPairCare, a sponsor agency that recruits, trains, and places immigrants in *au pair* positions throughout the United States. The agency is entrusted by the United States Department of State ("State Department") to ensure compliance with the J-1 visa program rules and regulations. Instead, Defendants AuPairCare facilitated abuse of Plaintiff Cuenca-Vidarte by acting as

an employer and dictating that host families pay subminimum wages while knowingly benefiting from forced labor, wage theft, and severe abuse.

5.      Plaintiffs bring this action against the Samuel Defendants. In addition, Plaintiff Tatiana Cuenca-Vidarte brings this action against AuPairCare, Inc., International Training and Exchange, Inc. ("Intrax") d/b/a AuPairCare, John F. Wilhelm, and Takeshi Yokota (collectively referred to as "Defendants AuPairCare").

6.      While Plaintiffs were employed by the Samuel family and AuPairCare (specific as to Plaintiff Cuenca-Vidarte), they routinely worked in excess of the 45 hours per week they were promised by their au pair agencies, and were directed to perform work that was far beyond childcare and child-related tasks.

7.      Additionally, Plaintiffs were cheated out of their hard-earned and legally mandated wages through manipulated contracts purporting to entitle Plaintiffs to only $195.75 for 45 hours of work, in violation of federal and state minimum wage and overtime laws.

8.      This action seeks compensatory and punitive damages for forced labor and trafficking with respect to forced labor under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1589, *et seq*.; unpaid minimum wages, unpaid overtime wages, and liquidated damages under the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201, *et seq*.; unpaid minimum wages, unpaid overtime wages, and liquidated damages under the Maryland Wage and Hour Law ("MWHL"), Md. Code Ann., Lab & Empl. § 3-401, *et seq*.; unpaid wages and treble damages under the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code Ann., Lab. & Empl. § 3-501, *et seq*.; and compensatory damages under Maryland law for breach of contract.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' related state law claims because these state law claims are so closely related to the federal claims that they form a part of the same case or controversy.

10.    Venue is proper pursuant to 28 U.S.C. § 1391. The Samuel Defendants are residents of Maryland and a substantial part of the events giving rise to the claims against all defendants occurred in the District of Maryland.

## PARTIES

11.    Plaintiff Tatiana Cuenca-Vidarte is a natural person who currently resides in Colombia, South America but performed most of the service at issue in this Complaint in Maryland.

12.    Plaintiff Sandra Peters (née Guzman-Reyes) is a natural person who resides in Maryland and performed most of the service at issue in this Complaint in Maryland.

13.    The Samuel Defendants are natural persons residing at 8200 Student Drive, Clinton, Prince George's County, MD 20735.

14.    Defendant AuPairCare Inc. is a business entity, now dissolved, with a last known registered business address of 600 California Street, Floor 10, San Francisco, California 94108. Defendant conducted business in Maryland by placing and training foreign *au pairs* in the State of Maryland.

15.     Defendant International Training and Exchange, Inc. ("Intrax") d/b/a AuPairCare is a successor to AuPairCare Inc. Intrax is a business entity registered as doing business out of 600 California Street, Floor 10, San Francisco, California 94108. Intrax conducts business in Maryland by placing and training foreign *au pairs* in the State of Maryland. It is owned and operated by the same individuals that operated AuPairCare Inc. and carries on the same business as AuPairCare Inc.—recruiting and matching *au pairs* with American host families.

16.     Defendant John F. Wilcox was an owner of AuPairCare Inc., and is the Director of Intrax. He has exerted substantial control over the management and operations of both named corporations, and he was personally involved with the actions and decisions that are the basis of this complaint.

17.     Defendant Takeshi Yokota was an owner of AuPairCare Inc. and is the Chief Executive Officer, Secretary, and Chief Financial Officer of Intrax. He has exerted substantial control over the management and operations of both named corporations and was personally involved with actions and decisions that are the basis of this complaint.

## STATEMENT OF THE FACTS

### The J-1 Visa Au Pair Program - Background

18.     In 1986, Congress created the J-1 visa *au pair* program ("*au pair* program" or "the program") as an implementation of the Mutual Educational and Cultural Exchange Act of 1961, as amended, Public Law 87–256, 22 U.S.C. § 2451, et seq. (1988). The program was designed to partner American host families with young foreign nationals who would

6

provide childcare in exchange for immersion in American culture and access to the American higher education system.

19.    The program allows unmarried foreign nationals between the ages of 18 and 26 with secondary school educations and English proficiency to work for "host families" as childcare workers in exchange for room, board, and a legal wage.

20.    The program is currently overseen and administered by the U.S. Department of State ("State Department").

21.    The State Department facilitates the *au pair* program by designating entities to act as sponsors, including Defendants AuPairCare.

22.    Defendants AuPairCare are authorized by the State Department to recruit and place *au pairs* with host families in the United States.

23.    Under State Department regulations, Defendants AuPairCare may not place an *au pair* with a host family unless the host family and the *au pair* have executed a written agreement detailing the *au pair*'s job description consistent with the rules of the *au pair* program and labor laws. Defendants AuPairCare are responsible for ensuring compliance with the program regulations.

24.    The program requires the *au pair* to live with the host family and places several other conditions on the terms of the *au pair*'s employment. Under these regulations, Defendants AuPairCare must limit the number of hours an *au pair* works to not more than 10 hours per day and not more than 45 hours per week. Defendants AuPairCare must also ensure that *au pairs* receive a minimum of one and a half days off per week, one complete weekend off every month, and an additional two weeks of paid vacation.

25.     In 1994, the government settled that participants in the program are full-time employees and are entitled to protections as such. The government also issued a final rulemaking which established a programmatic wage floor enumerating the minimum weekly wage for *au pairs*. At the time, the wage floor was set at not less than $115.00 per week.

26.     Soon thereafter, in June 1997, to "ensure that there is no future confusion regarding the payment of minimum wage," the government amended the rule to replace the specified programmatic wage floor with a reference to Fair Labor Standards Act ("FLSA") standards (*i.e.*, "in conformance with the requirements of the Fair Labor Standards Act as interpreted and implemented by the United States Department of Labor."). That rule remains in force today, codified at 22 C.F.R. § 62.31(j)(1).

27.     Under the FLSA, employers must pay *au pairs* the highest of the federal, state, or local minimum hourly wage and third-party employers must pay overtime. Moreover, as *au pairs* are required to live with the host family, lodging credits should not be taken from an *au pair*'s salary.

### Defendants are Joint Employers of Plaintiff Cuenca-Vidarte

28.     Host families in the *au pair* program are American families who wish to obtain the services of a foreign *au pair* to provide childcare. These families register and pay a fee to a sponsor organization that then vets them for participation in the program. Once vetted, a host family is given access to the sponsor's *au pair* marketplace.

29.     Host families interview with desired *au pairs*, and, if the host family and *au pair* agree, they are "matched." Once the host family is matched with an *au pair*, the sponsor

organization then initiates arrangements to bring the *au pair* to the United States for training and placement.

30.     The host family is responsible for providing food and lodging, paying the *au pair*'s weekly salary, and any transportation or educational costs due to the *au pair*.

31.     Host families directly supervise *au pairs* while in the home. As a part of the host family's contract with the sponsor, the host family determines an *au pair*'s daily schedule and approves an *au pair*'s vacation time.

32.     Although the host families determine the *au pair*'s day-to-day duties, Defendants AuPairCare acted as joint employers with the Samuel family.

33.     Plaintiff Cuenca-Vidarte performed the essential function of Defendants AuPairCare, *i.e.*, providing *au pair* services.

34.     Plaintiff Cuenca-Vidarte contracted her employment with the Samuel family through Defendants AuPairCare. Defendants AuPairCare prepared the contracts between itself and Plaintiff Cuenca-Vidarte, as well as the contract between Plaintiff Cuenca-Vidarte and Samuel Defendants. These contracts gave AuPairCare tremendous power over Plaintiff Cuenca-Vidarte.

35.     Defendants AuPairCare recruited and hired Plaintiff Cuenca-Vidarte.  Defendants AuPairCare trained Plaintiff Cuenca-Vidarte and required her to participate in 32-hours of unpaid training prior to her placement.

36.     Defendants AuPairCare set Plaintiff Cuenca-Vidarte's salary, determined the method of payment in terms of deductions for food and lodging, and provided health insurance.

37.     Defendants AuPairCare set and promulgated work rules, including rules regarding Plaintiff Cuenca-Vidarte's compensation, benefits, and hours. Defendants AuPairCare purported to control Plaintiff's hours by requiring her to work up to the maximum of 45 hours per week. Defendants AuPairCare also made additional rules and were the final arbiters of disputes between *au pairs* and host families regarding schedules, vacations, and stipends.

38.     Additionally, Defendants AuPairCare, per the terms and conditions of their agreement with Plaintiff Cuenca-Vidarte, had the power to fire and remove Plaintiff Cuenca-Vidarte from her matched host family and force her to repatriate to her home country at the Defendants AuPairCare's discretion—even for reasons not related to Plaintiff Cuenca-Vidarte or her performance. Through these means, Defendants AuPairCare effectively controlled the relationship between Plaintiff Cuenca-Vidarte and any host family.

39.     The power Defendants AuPairCare maintained over the Plaintiff Cuenca-Vidarte is clearly illustrated in Defendants AuPairCare's contract with her.

40.     Although the contract attempted to limit Defendants AuPairCare's liability as an employer, it contained numerous provisions governing Plaintiff Cuenca-Vidarte's employment. Specifically, the contract stipulated that if Plaintiff Cuenca-Vidarte  was required to drive, she must obtain her license before arrival; the contract further limited Plaintiff Cuenca-Vidarte's use of the internet and her legal consumption of alcoholic beverages while in the host family's home; and it banned Plaintiff Cuenca-Vidarte from legally smoking tobacco during the program. Any violation of these terms would result in

Plaintiff Cuenca-Vidarte's termination from the program and repatriation to her home country.

41.    Additionally, Defendants AuPairCare provided health insurance for Plaintiff Cuenca-Vidarte and required her to submit to whatever medical treatment AuPairCare and/or its affiliates "deem[ed] necessary."  In addition, Defendants AuPairCare could, at their sole discretion, terminate Plaintiff Cuenca-Vidarte from the program for "display[ing] a serious medical condition…either pre-existing or new."

42.    Defendants AuPairCare also dictated the terms under which Plaintiff Cuenca-Vidarte could be "rematched" and placed with a new family. Defendants AuPairCare required Plaintiff Cuenca-Vidarte to complete a 60-day "initial adjustment period" before considering a rematch. Plaintiff Cuenca-Vidarte was obligated to "show a sustained good faith effort to resolve issues with the host family before AuPairCare [would] approve [a] request for a placement change." Moreover, Defendants AuPairCare dictated that it had the final and sole discretion to make "any decision regarding an *au pair*'s program status, dismissal, or re-placement."

43.    As described above, Defendants AuPairCare jointly employed Plaintiff Cuenca-Vidarte with Samuel Defendants.

### Plaintiff Cuenca-Vidarte's *Au Pair* Experience

44.    In 2017, Plaintiff Cuenca-Vidarte paid 5,200 Colombian pesos, or approximately $1,400 U.S. dollars, to participate in the J-1 visa program through Defendants AuPairCare. Defendants AuPairCare's agent described the program as a wonderful opportunity to live

and work in the United States while taking classes and improving her English-speaking skills.

45.     Plaintiff Cuenca-Vidarte completed the application and matching processes. In November 2017, Ms. Cuenca-Vidarte arrived in the United States and Defendants AuPairCare placed her with the Samuel Defendants.

46.     Pursuant to her contract with AuPairCare, Plaintiff Cuenca-Vidarte was to provide childcare and child-related tasks for the Samuel family; those tasks were to include general supervision, meal preparation, and light housekeeping as it related to the children.

47.     The contract explicitly excluded "heavy housework…or other non-child related labor for the household."

48.      Pursuant to federal law, Plaintiff Cuenca-Vidarte was to work not more than 45 hours per week or ten hours per day. She was to have a minimum of one- and one-half days off every week and one full weekend off, enumerated as Friday evening to Monday morning, every month.

49.     Despite agreeing to these terms, the Samuel family routinely flouted their statutory and contractual obligations as employers by requiring Plaintiff Cuenca-Vidarte to do heavy housework and to work far in excess of the maximum hours set by law.

50.     The Samuel Defendants exerted extreme control over Plaintiff Cuenca-Vidarte by monitoring her every move through a network of surveillance cameras placed throughout the house and front and back yards. The Samuel Defendants would reprimand and berate Plaintiff Cuenca-Vidarte if she did not comply with a highly regimented daily schedule of childcare and house cleaning.

51.     The Samuel Defendants required Plaintiff Cuenca-Vidarte to perform heavy non-childcare-related work that included mopping and cleaning windows, doors, and light switches. Defendants compelled her to deep clean the kitchen including cleaning the oven, microwave, tables, cabinets, refrigerator, and stove. The Samuel Defendants pushed her to use harsh cleaning supplies and bleach, sometimes without providing her with gloves. As a result, Plaintiff Cuenca-Vidarte's hands became dry and cracked from the harsh chemicals, and she developed a chemical sensitivity to cleaning supplies that persists to this day.

52.     When Plaintiff Cuenca-Vidarte objected to these additional cleaning tasks, the Samuel Defendants retaliated by restricting her access to certain parts of the house. One such instance occurred when the Samuel Defendants told her she was no longer allowed to use the guest bathroom after Plaintiff objected to cleaning it more than twice a month.

53.     The Samuel Defendants manipulated Plaintiff Cuenca-Vidarte under the guise of telling her she was a "family member" to justify why she had to complete these additional cleaning tasks. Yet, she was not treated as a family member. Rather, she was treated as a servant who had no choice but to obey orders and to undertake any tasks assigned by the Samuel family.

54.     The Samuel Defendants also restricted Plaintiff Cuenca-Vidarte's access to food in multiple ways. First, they only provided Plaintiff Cuenca-Vidarte with a limited variety of cheap, mostly processed food items, such as chicken nuggets, meatballs, milk, beans, rice, and bread. Although the Samuel family had fresh fruits and vegetables, they told her she was only allowed to eat the cheaper, less nutritious food that the Samuel Defendants had

purchased and set aside for her. The Samuel family's filtered water was also off limits to Plaintiff Cuenca-Vidarte.

55.    Plaintiff Cuenca-Vidarte was only allowed to use the kitchen to prepare meals for herself during her "designated time." She was strictly prohibited from using the kitchen when the Samuel family was using the kitchen. This generally restricted her use of the kitchen to before 9:00 am or after 9:00 pm. Plaintiff Cuenca-Vidarte's ability to have a cooked meal before 9:00 pm was conditioned on her continued interaction with the Samuel family. If Plaintiff Cuenca-Vidarte wished to eat with the family, she could not retreat to her room after the conclusion of her workday and extra housekeeping duties, but rather had to continue to interact with the Samuel family and watch the children while Dr. Samuel cooked—a stipulation that only further extended her hours. After dinner, Plaintiff Cuenca-Vidarte would have to wash the dishes and cookware by hand, despite the presence of a dishwasher in the home. This was usually followed by having to clean the stove, sweep the floor, and clear the dining room table.

56.    The Samuel Defendants went to great lengths to control Plaintiff Cuenca-Vidarte. They even set a 15-minute shower time limit and required her to clean the bathtub immediately after she showered. This had a psychological impact on Plaintiff Cuenca-Vidarte.

57.    Pursuant to her contract with Defendants AuPairCare, Plaintiff Cuenca-Vidarte was entitled to ten days of paid vacation time. However, Plaintiff Cuenca-Vidarte was unable to take this vacation time. Rather, Dr. Samuel asked Plaintiff Cuenca-Vidarte to use her second week of vacation to accompany the family to Grenada. Dr. Samuel told her she

would not be required to work much, if at all during the trip, and that if she did work, she would be paid extra. Tati felt pressure to go, and ultimately decided to go because she had no money and wanted to go on a vacation. Despite Dr. Samuel's representations, the Samuel Defendants required Plaintiff Cuenca-Vidarte to work every day of the trip. She had no privacy because she had to share a room with the family. She had to clean baby bottles, prepare food, and dress the children. Plaintiff Cuenca-Vidarte was also left alone with the children on several occasions. The only night she did not work was the evening before they were scheduled to return to the United States. Plaintiff Cuenca-Vidarte was not paid for this time in Grenada.

58.     The Samuel Defendants regularly belittled and berated Plaintiff Cuenca-Vidarte by calling her stupid, dirty, useless, and slow, and told her that there was something wrong with her. As a result of this verbal abuse, Plaintiff Cuenca-Vidarte developed anxiety and low self-esteem.

59.     The Samuel Defendants also micromanaged Plaintiff Cuenca-Vidarte and constantly required her to re-do cleaning tasks. If Plaintiff Cuenca-Vidarte objected to the number of tasks she was required to complete, Dr. Samuel would tell her to stop complaining and work harder.

60.     The Samuel Defendants repeatedly directed Plaintiff Cuenca-Vidarte to be grateful because they allowed her to continue working and living with them in spite of her "bad work."

61.     The Samuel Defendants also exerted intense control over Plaintiff Cuenca-Vidarte's movement in several ways. For example, they often forbade her from using their car,

despite requiring her to get a drivers' license. Additionally, every time Plaintiff Cuenca-Vidarte left the Samuel family's home she had to notify the Samuel family and inform them of who she was meeting with and what she was going to do. In one instance, Dr. Samuel drove over to Plaintiff Cuenca-Vidarte's friend's house while she was there visiting to evaluate whether Plaintiff Cuenca-Vidarte could spend time with her friend again in the future.

62.     The Samuel Defendants often met Plaintiff Cuenca-Vidarte's protests and complaints with the veiled threat of deportation. Although the contract with Defendants AuPairCare gave Plaintiff Cuenca-Vidarte the right to seek a placement ("rematch") with another family, the process required a positive recommendation from the Samuel Defendants, her current host family. Without a positive recommendation from the current host family a rematch would fail and thus force Plaintiff Cuenca-Vidarte to return to her home country.

63.     Knowing this, the Samuel Defendants often threatened to give Plaintiff Cuenca-Vidarte a terrible reference if she failed to comply with their every demand, including their demands that she work in excess of the weekly 45-hours set by the contract. As evidence of the strength of this threat, Dr. Samuel informed Plaintiff Cuenca-Vidarte about a prior *au pair* who had worked for the family who was unable to rematch and was forced to return to Colombia. Hearing this scared Plaintiff Cuenca-Vidarte and she felt compelled to continue working for the Samuel Defendants.

64.     Defendants AuPairCare did not readily support Plaintiff Cuenca-Vidarte in addressing the deplorable situation with the Samuel Defendants. Plaintiff Cuenca-Vidarte

16

made numerous attempts to communicate with Defendants AuPairCare about the abuse and mistreatment she experienced in the Samuel Defendants' household. However, Defendants AuPairCare took no action to protect Plaintiff Cuenca-Vidarte or to remedy the situation.

65.     In an effort to prevent her from working elsewhere, the Samuel Defendants repeatedly told Plaintiff Cuenca-Vidarte that no other family would accept her in their home and that even if that were to happen, they would provide a negative recommendation to impede a rematch.

66.     The Samuel Defendants eventually acted on their threats to force Plaintiff Cuenca-Vidarte to go back to Colombia. When Plaintiff Cuenca-Vidarte had the opportunity to rematch with another family, the Samuel Defendants blocked her access to the internet and gave her negative references.

67.     Plaintiff Cuenca-Vidarte interviewed with three different families and although they expressed interest in hiring her as an *au pair*, each family ultimately declined after talking with the Samuel Defendants.

68.     As a result of the Samuel Defendants' unrelenting work schedule, constant surveillance, verbal abuse, movement restriction, and not giving her healthy food, Plaintiff Cuenca-Vidarte experienced a high level of stress and overall lack of nutrition that caused her to lose hair and gain weight.

69.     Throughout the course of her time working for the Samuel Defendants, Plaintiff Cuenca-Vidarte was paid $195.75 per week. She did not receive an overtime premium for those hours worked beyond 40 hours per week.

17

70.     Plaintiff Cuenca-Vidarte was also not reimbursed the $395.15 in transportation costs and the $252.00 in education expenses that the Samuel Defendants were to pay per her contract with Defendants AuPairCare.

71.     Additionally, Plaintiff Cuenca-Vidarte was required to spend $31.14 of her salary to replace an entire 100-piece counting toy when a single piece went missing.

### Plaintiff Peters' Au Pair Experience

72.     Plaintiff Peters is originally from San Juan de los Lagos, Mexico.

73.     In 2016, Plaintiff Peters joined the J-1 visa program through Sponsor Au Pair in America.[1]

74.     Plaintiff Peters wanted to be an *au pair* so she could come to the United States and learn English and experience American culture while advancing her professional goals.

75.     In early 2016, Plaintiff Peters interviewed with the Samuel family via Skype. Although she had a bad impression of the family based on the interview, Plaintiff Peters felt she had to take the position as she was about the turn 26—the upper boundary of the program's age restriction.

76.     Plaintiff Peters was matched with the Samuel family and in June 2016 moved into the Samuel family's home in Clinton, Maryland.

77.     Plaintiff Peters received a training and orientation by her sponsor agency. She recalls that the training was in English and she did not understand everything that she was

---

[1] Au Pair in America is one of the sponsor organizations under the J-1 visa program but is not a defendant in this case.

told. She was neither advised of her labor rights in the United States nor informed of minimum wage laws.

78.     The Samuel Defendants did not inform Plaintiff Peters of her labor rights under state and federal law in Maryland.

79.     During her time working for the Samuel family, Plaintiff Peters performed both childcare and housework.

80.     Plaintiff Peters' childcare duties included a vigorous timetable of nine hours of meticulously scheduled childcare activities at least five days per week. She was also responsible for cleaning the child's bedroom and bathroom and doing his laundry. The Samuel Defendants prepared these daily schedules and expected Plaintiff Peters to do everything, even though the tasks went beyond the nine-hour daily program.

81.     In addition to her child-related duties, Plaintiff Peters was required to clean the living room, kitchen, stairs, and guest bathroom. In total, the Samuel Defendants required her to work approximately 60 hours per week.

82.     The Samuel Defendants berated her and threatened her with deportation if Plaintiff Peters failed to adhere to the strict daily schedule. The Samuel Defendants told her repeatedly that she should be "grateful" for being allowed to live in the home and told her that she was "dirty." This poor treatment from the Samuel Defendants took a mental and physical toll on Plaintiff Peters. She lost weight; she could not sleep; and she lived in fear of the Samuel Defendants' threats to terminate her from the program.

83.     Plaintiff Peters was also not allowed to move freely throughout the Samuel family's home. Plaintiff Peters was constantly monitored by video cameras during her time with the

Samuel family. She was only allowed to engage in recreational or leisure activities in her bedroom. The Samuel Defendants used these cameras to constantly monitor Plaintiff Peters' movement.

84.     Although the law required that the employer provide Plaintiff Peters at least 1.5 days off per week and one entire weekend off per month, the Samuel Defendants rarely allowed her this mandated time off.

85.     The Samuel Defendants forced Plaintiff Peters to work an even more grueling schedule when accompanying Dr. Samuel on a vacation. In fall 2016, Plaintiff Peters travelled to the Virgin Islands to take care of the Samuel child while Dr. Samuel participated in a work-related conference. During this week, Defendant Samuel required Plaintiff Peters to care for the child 24 hours a day, including getting up with him throughout the night. Although the program required Plaintiff Peters to have her own room while in the employ of the Samuel Defendants, Plaintiff Peters had to share a single room with Dr. Samuel and the child. Plaintiff Peters was not allowed to take the child to the pool or enjoy any off-duty time during the week in the Virgin Islands.

86.     The Samuel Defendants required Plaintiff Peters to adhere to a 10:00 pm curfew every day, regardless of whether they scheduled her to work the following day. To ensure that Plaintiff Peters could not go out freely, in spite of being an adult woman, the Samuel Defendants did not give her the alarm code, even when Plaintiff Peters asked for it.

87.     Although the contract and the Samuel Defendants gave the impression that Plaintiff Peters was to be treated like a "family member," the Samuel Defendants limited her access to food and only gave her cheap, mostly processed food such as chicken nuggets, meatballs,

cereal, and milk. The Samuel Defendants explicitly prohibited Plaintiff Peters from eating the fruits and vegetable available to the Samuel family.  In one instance, Plaintiff Peters took some bread from the Samuel family to make herself a sandwich. Plaintiff Peters hoped to avoid the cameras, but the Samuel Defendants nonetheless saw her and yelled at her for taking their bread. They told Plaintiff Peters that she was not allowed to touch the Samuel family's food.

88.    Plaintiff Peters suffered stress and a loss of nutrition. She lost hair and weight. She could not sleep, and would often go to bed hungry because she did not have access to healthy food until after 9 pm.

89.    The Samuel Defendants provided Plaintiff Peters with a cellular phone. This phone was Plaintiff Peters' only method of contacting her family in Mexico. Although the phone was in her possession, in actuality Plaintiff Peters had very little freedom to contact other individuals. Plaintiff Peters could not use the phone during her working hours or during dinner time and the Samuel Defendants did not allow Plaintiff Peters to update the phone with her personal information. Additionally, on at least one occasion, Dr. Samuel took Plaintiff Peters' phone and accessed her WhatsApp messages.  In late February or early March of 2017, the Samuel Defendants confiscated her phone, and left Plaintiff Peters with no way to contact her family or the sponsor agency until the end of her tenure.

90.    Plaintiff Peters also suffered mental and emotional abuse perpetrated by the Samuel family. For example, in 2017, after working 10.5 hours on the day of the Super Bowl, Plaintiff Peters took the Samuel child to her room to watch the Half Time Show, as Plaintiff Peters was not allowed to watch television in the common areas. Upon realizing that

Plaintiff Peters was watching the Super Bowl with the child in her room, Dr. Samuel called and berated Plaintiff Peters. Dr. Samuel yelled at her to get the child out of her room. Within 15 minutes, Mr. Ishaeik arrived. Mr. Ishaeik threatened Plaintiff Peters by telling her that he would call the police and would claim that she had sexually abused the Samuel child, adding that then she would go to jail and be deported.

91.    Plaintiff Peters believed she had to continue working for the Samuel Defendants, because if she did not, they would terminate her from the program and force her to return to her home country, having incurred substantial debt to be an *au pair*. The Samuel Defendants repeatedly threatened her with a poor recommendation to any future family and therefore impeded her chances of extending her participation in the *au pair* program.

92.    Plaintiff Peters had no one in the United States that she could turn to for help. In one instance, the Samuel Defendants called the sponsor agency counselor to complain about Plaintiff Peters. Plaintiff Peters was not given an opportunity to speak privately with the sponsor agency counselor.

93.    The Samuel Defendants' abusive treatment towards Plaintiff Peters reached its tipping point on March 11, 2017. That day, Plaintiff Peters had plans to meet with friends during the day, as she was not scheduled to work until 8 pm. At approximately 12 pm, as Plaintiff Peters was preparing to leave, the Samuel Defendants demanded that she return to the house by 4 pm—four hours prior to the start of her shift. Plaintiff Peters found this unreasonable, as it was a two hour commute each way to where she was meeting her friends. The Samuel Defendants' demand meant that she would have no time to enjoy her time off. When she challenged the Samuel Defendants on this demand, the Samuel

Defendants once again threatened to call the program and have Plaintiff Peters deported. Despite these threats, Plaintiff Peters left the home to meet with friends. Later that evening, Plaintiff Peters was contacted by the sponsor agency program counselor. She was informed that Samuel Defendants had called the police on Plaintiff Peters, accused her of attempting to hit Dr. Samuel, and refused to allow her to return to the home. Plaintiff Peters was rendered homeless. When Plaintiff Peters attempted to retrieve her belongings, including her visa and passport, the Samuel Defendants refused to give Plaintiff Peters her belongings. The Samuel Defendants did not allow her to retrieve her immigration documents until an agent from the sponsor agency intervened on her behalf.

### Statement of Plaintiffs' Length of Placement with Samuel Defendants and Rate of Pay

94.     Plaintiff Cuenca-Vidarte worked in the Samuel Defendants' home through Defendants AuPairCare from November 7, 2017 to September 28, 2018. Defendants paid her $195.75 per week, regardless of the overtime hours she worked.

95.     Plaintiff Peters worked in Samuel Defendants' home from June 16, 2016 to March 11, 2017. Defendants paid her $195.75 per week, regardless of the overtime hours she worked. The only additional compensation she received was $20.00 approximately once a month for ironing the Samuel family members' clothing.

### Equitable Tolling as to Plaintiff Peters with Respect to Federal and State Wage and Hour Claims.

96.     Plaintiff Peters is a foreign national with limited English understanding. She has severely limited knowledge and understanding of common federal and state laws, and no knowledge or understanding of the specialized field of labor and employment law.

23

97.    Prior to joining the J-1 visa program and working in the Samuel Defendants' home, Plaintiff Peters had never been to or worked in the United States.

98.    Plaintiff Peters relied on her *au pair* sponsor agency to protect her legal interests while in the United States. This reliance was reasonable, as the sponsor purported to have superior knowledge and specialized information of the law regarding *au pair* wages.

99.    Her sponsor agency informed Plaintiff Peters that the $195.75 *au pair* wage was set by the government. This implied that the wage was legal and non-negotiable.

100.    During the time Plaintiff Peters worked in the Samuel Defendants home, the Samuel Defendants never posted the required FLSA poster in the home, spoke to Plaintiff Peters about her wages, or gave her any notices about minimum wage laws.

101.    Plaintiff Peters relied on the assertion that $195.75 was a legal wage for the work she did in the Samuel family's home. This reliance prevented Plaintiff Peters from being able to exercise her rights to bargain for a higher wage or to assert her right to be paid the legal minimum wage for all hours worked.

102.    During her participation in the program, the Samuel Defendants limited and monitored Plaintiff Peters' actions. Plaintiff Peters did not know she had rights regarding her wages and never received information as to what to do or whom to ask for assistance with such matters.

103.    The only information Plaintiff Peters received about her rights was a small flyer with the number the National Human Trafficking Hotline. This flyer was very specific and only detailed what to do if she were forcibly separated from her immigration documents. It did not inform Plaintiff Peters that the Samuel Defendants' belittlement, threats of

deportation, constant monitoring, and limitation of her movement and access to food could also qualify as human trafficking, or that she was afforded additional rights under federal and state wage and hour laws.

104.    Moreover, the Samuel Defendants intimidation of Plaintiff Peters was so effective that Plaintiff Peters did not stringently protest her treatment for fear that the Samuel Defendants would make good on their threats to have her arrested and/or removed from the program and deported.

105.   Plaintiff Peters participated in the *au pair* program from June 16, 2016 until March 11, 2017. Statutorily, these dates fall outside of filing deadlines for the enumerated federal and state wage and hour laws.

106.    However, under these extraordinary circumstances, including Plaintiff Peters' unfamiliarity with federal and state laws, her lack of experience in the American labor force, the Samuel Defendants' failure to notify Plaintiff Peters of her rights by posting the required FLSA flyer, and the Samuel Defendants' efforts to subjugate Plaintiff Peters, the Court should grant Plaintiff Peters equitable tolling of the FLSA and Maryland Wage and Hour and Wage Payment and Collections laws.

## CAUSES OF ACTION

### Count I
### Forced Labor in Violation of 18 U.S.C. §§ 1589, 1590, and 1595
*Brought by Plaintiff Cuenca-Vidarte against all Defendants*
*Brought by Plaintiff Peters against Samuel Defendants*

107.    Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

108.     As set forth in 18 U.S.C. § 1595(a), the TVPRA allows victims to "bring a civil action against…whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of [the TVPRA]."

### A. Forced Labor under 18 U.S.C. § 1589

109.     As set forth above, the Samuel Defendants knowingly obtained labor from Plaintiffs' labor between June 2016 to March 2017 and November 2017 to September 2018 in violation of 18 U.S.C. § 1589(a).

110.     The Samuel Defendants knowingly compelled Plaintiffs to work against their will by psychologically and emotionally abusing Plaintiffs, by threatening to blacklist Plaintiffs and to make false allegations of abuse against Plaintiffs, and by refusing to pay Plaintiffs their legally due wages, all of which caused serious harm under 18 U.S.C. § 1589(a)(2).

111.     The Samuel Defendants knowingly compelled Plaintiffs to work against their will by threatening Plaintiffs with actual and de facto deportation if Plaintiffs failed to yield to their demands, in a manner that constituted an abuse of the legal process under 18 U.S.C. § 1589(a)(3).

112.     The Samuel Defendants knowingly compelled Plaintiffs to work against their will by a scheme, plan, or pattern of psychological, emotional, and reputational abuse, and legal threats, which, in the totality of the circumstances, was intended to cause and did cause Plaintiffs to believe that they would suffer serious harm if they were to leave the employ of Defendants in violation of 18 U.S.C. § 1589(a)(4).

113.   Defendants AuPairCare knowingly benefitted from participation in a venture with the Samuel Defendants by accepting application, placement, and program fees from Plaintiff Cuenca-Vidarte and the Samuel Defendants, as well as by accepting the benefit of Plaintiff Cuenca-Vidarte's labor, which had the effect of ensuring the Samuel Defendants' continued participation in Defendants AuPairCare's program.

114.   Defendants AuPairCare's participation in this venture was in knowing or reckless disregard of the fact that the venture provided or obtained labor from Plaintiff Cuenca-Vidarte in violation of 18 U.S.C. § 1589(a). *See* 18 U.S.C. § 1589(b). Defendants AuPairCare knew or should have known that the Samuel Defendants obtained labor from Plaintiff Cuenca-Vidarte in the manner described above.

115.   These actions resulted in severe emotional and economic damages to Plaintiffs. Plaintiffs, therefore, are entitled to recover compensatory and punitive damages, attorneys' fees, costs, and other relief that the Court may deem proper. 18 U.S.C. § 1595(a).

## B.  Trafficking with Respect to Forced Labor under 18 U.S.C. § 1590

116.   The Samuel and AuPairCare Defendants knowingly participated in a venture to recruit, harbor, transport, provide or obtain Plaintiffs for their labor and services in violation of 18 U.S.C. § 1589. *See* 18 U.S.C. § 1590.

117.   These actions resulted in severe emotional and economic damages to Plaintiffs. Plaintiffs, therefore, are entitled to recover compensatory and punitive damages, attorneys' fees, costs, and other relief that the Court may deem proper. 18 U.S.C. § 1595(a).

**Count II**
**Violations of the Fair Labor Standards Act**
**(29 U.S.C. § 201 _et seq._)**
_Brought by Plaintiff Cuenca-Vidarte against all Defendants_
_Brought by Plaintiff Peters against Samuel Defendants_

118.    Plaintiffs repeat and incorporate by reference the allegations set forth above.

119.    Based on the nature of Defendants AuPairCare's operations, including recruiting workers from foreign countries, transporting them to the United States, training them, employing them, and monitoring them, at all relevant times, Defendants AuPairCare had two or more employees that handled goods or materials that had been moved in or produced for interstate commerce, including computers and telephones.

120.    Plaintiffs Cuenca-Vidarte and Peters were "employees" as defined by 29 U.S.C. § 203(e) and Plaintiffs are covered as employees in domestic service under 29 U.S.C. § 206(f).

121.    All Defendants are "employers" as defined by 29 U.S.C. § 203(d).

122.    Defendants AuPairCare suffered and permitted Plaintiff Cuenca-Vidarte to work because it controlled her recruitment, had the ability to terminate her participation in the program, trained her, maintained records, controlled where she worked, set the terms of her employment contracts, and set her wage rates.

123.    The Samuel Defendants directly suffered and permitted Plaintiffs Cuenca-Vidarte and Peters to work by directly ordering and supervising their work and day-to-day activities.

124.    The Samuel Defendants are jointly and severally liable with Defendants AuPairCare for FLSA violations as they relate to Plaintiff Cuenca-Vidarte.

125.   The Samuel Defendants violated the FLSA by failing to pay Plaintiff Cuenca-Vidarte and Plaintiff Peters at least the federal minimum wage for all hours worked. 29 U.S.C. § 206.

126.   Defendants AuPairCare violated the FLSA by failing to pay Plaintiff Cuenca-Vidarte at least the federal minimum wage for all hours worked and by failing to pay the required overtime wages. 29 U.S.C. §§ 206, 207.

127.   Defendants' violations of the FLSA were willful under 29 U.S.C. § 255(a) because they knew or should have known that Plaintiffs Cuenca-Vidarte and Peters were entitled to the minimum wage and, in Plaintiff Cuenca-Vidarte's case, overtime under FLSA, and/or, upon information and belief, Defendants failed to make an adequate inquiry regarding whether Plaintiffs were covered by the FLSA.

128.   Defendants' actions were deliberate, intentional, and willful. Defendants are liable to Plaintiffs Cuenca-Vidarte and Peters under § 216(b) of the FLSA for their unpaid minimum wages and, in Plaintiff Cuenca-Vidarte's case, overtime compensation, plus an additional equal amount in liquidated damages, costs, interest, reasonable attorneys' fees, and any other relief deemed appropriate by the Court.

<u>**Count III**</u>
<u>**Violations of the Maryland Wage and Hour Law**</u>
<u>**(MD Code Ann., Lab & Empl., § 3-401 *et seq.*)**</u>
*Brought by Plaintiff Cuenca-Vidarte against all Defendants*
*Brought by Plaintiff Peters against Samuel Defendants*

129.   Plaintiffs repeat and incorporate by reference the allegations set forth above.

130.   The Samuel Defendants violated the Maryland Wage and Hour Law ("MWHL") by failing to pay Plaintiffs Cuenca-Vidarte and Peters at least the minimum wage for all hours

worked in compliance with the MWHL and the Prince George's County Code § 13A-117 governing minimum wages.

131.    Defendants AuPairCare violated the MWHL by failing to pay Plaintiff Cuenca-Vidarte at least the minimum wage for all hours worked in compliance with the MWHL and the Prince George's County Code § 13A-117 governing minimum wages.

132.    The Samuel Defendants failed to pay Plaintiffs an overtime wage of at least one-and-one-half-times their usual hourly wages for each hour in excess of 40 hours per week, in violation of Md. Code, Labor and Employment Article §§ 3-415(a) and 3-420.

133.    Defendants AuPairCare failed to pay Plaintiff Cuenca-Vidarte an overtime wage of at least one-and-one-half-times her usual hourly wages for each hour in excess of 40 hours per week, in violation of Md. Code, Labor and Employment Article §§ 3-415(a) and 3-420.

134.    Defendants are liable to Plaintiff Cuenca-Vidarte and/or Plaintiff Peters pursuant to § 3-427(a) and (d) of the MWHL for their unpaid minimum wages, unpaid overtime compensation, plus an additional equal amount in liquidated damages, costs, interest, reasonable attorneys' fees, and any other relief deemed appropriate by the Court.

**Count IV**
**Violations of Maryland Wage and Payment Collection Law**
**(MD Code Ann., Lab. & Empl., § 3-501 *et seq.*)**
*Brought by Plaintiff Cuenca-Vidarte against all Defendants*
*Brought by Plaintiff Peters against Samuel Defendants*

135.    Plaintiffs repeat and incorporate by reference the allegations set forth above.

136.   Pursuant to the Maryland Wage and Payment Collection Law ("MWPCL"), employers must pay its employees all wages due at regular pay periods. "Wage" is defined as "all compensation that is due to an employee for employment" and specifically includes overtime wages. *Id.* § 3-501(c).

137.   The Samuel Defendants willfully failed to timely pay Plaintiffs Cuenca-Vidarte and Peters wages for all hours worked, in violation of Md. Code, Labor and Employment Article § 3-502(a).

138.   Defendants AuPairCare willfully failed to timely pay Plaintiff Cuenca-Vidarte for all hours worked, in violation of Md. Code, Labor and Employment Article § 3-502(a).

139.   Defendants' unlawful failure or refusal to timely pay Plaintiffs all of their earned wages was not in good faith, was not reasonable, did not result from a legitimate dispute over the validity of their claims or the amounts they were owed, and was not otherwise the result of a bona fide dispute.

140.   Defendants are liable to Plaintiff Cuenca-Vidarte and/or Plaintiff Peters pursuant to § 3-507.2 of the MWPCL for their unpaid wages, plus treble damages, costs, reasonable attorneys' fees, and any other relief deemed appropriate by the Court.

**<u>Count V</u>**
**<u>Breach of Contract</u>**
*Brought by Plaintiff Cuenca-Vidarte against all Defendants*
*Brought by Plaintiff Peters against Samuel Defendants*

141.   Plaintiffs repeat and incorporate by reference the allegations set forth above.

142.   Plaintiff Cuenca-Vidarte entered into separate but related contracts with Defendants AuPairCare and Samuel Defendants.

143.   Plaintiff Peters entered into a contract with the Samuel Defendants.

144.   In all contracts, Defendants agreed that Plaintiffs would perform childcare services and light housekeeping related to childcare and that these duties would not exceed 10 hours per day or more than 45 hours per week. Defendants further agreed that Plaintiffs would be guaranteed one- and one-half days off per week and at least one full weekend off per month.

145.   In both contracts, Defendants agreed that Plaintiffs' duties would be limited to childcare and childcare-related tasks, and that Plaintiffs would not perform heavy housework or other non-child related labor for the household.

146.   In both contracts, Defendants agreed that Plaintiffs' weekly salary would be in accordance with the U.S. Department of State regulations.

147.   Defendants also agreed to reimburse Plaintiff Cuenca-Vidarte for educational expenses up to $500, and to pay for her transportation to and from her classes.

148.   Defendants individually breached the terms of their contracts with Plaintiffs.

149.   The Samuel Defendants imposed a rigorous and unrelenting schedule of duties and chores upon Plaintiffs Cuenca-Vidarte and Peters. The Samuel Defendants knew or reasonably should have known that the required tasks could not be completed in the allotted 10-hour workday. Despite this, the Samuel Defendants did not change the schedule or assigned tasks, but instead required Plaintiffs to work unpaid overtime hours to complete the tasks.

150.   Moreover, the Samuel Defendants forced Plaintiffs to complete non-childcare related cleaning and heavy housework in violation of the contract under the guise of "family participation." Plaintiffs were required to deep clean family areas including mopping floors and washing windows. Additionally, Plaintiffs were required to clean guest bathrooms and to "interact with the family" (*i.e.*, watch the child/children) and deep clean the kitchen during their purported "off hours" in order to partake in meals. Any resistance to these additional duties and unpaid labor resulted in limited or no access to these areas.

151.   The Samuel Defendants also did not reimburse Plaintiffs for education and education-related travel expenses. Plaintiff Cuenca-Vidarte incurred $644.15 in unreimbursed education and travel expenses.

152.   The Samuel Defendants published an extensive document detailing the expectations and requirements of *au pairs* in the Samuel's household. The Samuel Defendants also disseminated weekly schedules indicating the labor they required Plaintiffs to perform.

153.   Defendants AuPairCare were responsible for ensuring that host families abide by the regulations and terms of their contract with Plaintiff Cuenca-Vidarte.

154.   Defendants AuPairCare knew or were willfully ignorant of the breaches of contract perpetrated by the Samuel Defendants with respect to their contract with Plaintiff Cuenca-Vidarte.

155.   Defendants are liable to Plaintiff Cuenca-Vidarte and/or Plaintiff Peters for compensatory damages for breach of contract.

## **PRAYER FOR RELIEF**

156.   WHEREFORE, Plaintiffs respectfully request that judgment be entered in

their favor as follows:

a.   Declare Defendants in violation of the counts set forth above;

b.   Award to each Plaintiff actual, compensatory, and punitive damages for

forced labor and trafficking under the TVPRA;

c.   Award to each Plaintiff all unpaid minimum and overtime wages owed to

them by Defendants, plus liquidated damages as appropriate and warranted

under the FLSA;

d.   Award to each Plaintiff all unpaid minimum and overtime wages owed to

them by Defendants, plus liquidated damages as appropriate and warranted

under the MWHL;

e.   Award to each Plaintiff all unpaid minimum and overtime wages owed to

them by Defendants, plus treble damages as appropriate and warranted under

the MWPCL;

f.   Award to each Plaintiff compensatory damages under Maryland law for

breach of contract;

g.   Award Plaintiffs pre- and post-judgment interest on all amounts owed, as

allowed by law;

h.   Award to Plaintiffs the costs and attorneys' fees incurred in this action; and

i.   Award any and all such other and further relief as this Court deems just and

proper.

Respectfully submitted,


By:    _____/s/_____
Christopher R. Ryon (Federal Bar No. 27768)
Trevonne Walford (*Application for Admission
to Practice in the District of Maryland pending)
KAHN, SMITH & COLLINS, P.A.
201 N. Charles Street
Tenth Floor
Baltimore Maryland 21201 4102
Phone: 410-244-1010
Fax:  410-244-8001
ryon@kahnsmith.com
walford@kahnsmith.com
Attorneys for Plaintiffs


Sulma Guzmán (Federal Bar No. 07245)
Julie Pittman (*Application for Admission to
Practice in the District of Maryland pending)
CENTRO DE LOS DERECHOS DEL
MIGRANTE, INC.
10 E. North Avenue, Suite 9
Baltimore, Maryland 21202
Phone: 410-783-0236
sulma@cdmigrante.org
julie@cdmigrante.org
Attorneys for Plaintiffs


## PRAYER FOR JURY TRIAL

Plaintiffs hereby request a trial by jury on all claims so triable.


_____/s/_____
Christopher R. Ryon


35