**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | | |
|---|---|---|
| **TATIANA CUENCA-VIDARTE, et al.,** | * | |
| **Plaintiffs,** | * | |
| **v.** | | **Case No.: GJH-20-1885** |
| | * | |
| **MICHAELE C. SAMUEL, et al.,** | * | |
| | * | |
| **Defendants.** | | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Plaintiffs Tatiana Cuenca-Vidarte and Sandra Peters brought this civil action against Defendants AuPair Inc., International Training and Exchange, Inc. d/b/a Intrax d/b/a AuPair Care, John Wilhelm and Takeshi Yokota (collectively "APC Defendants"), and Michaele C. Samuel and Adam Ishaeik ("Samuel Defendants") alleging violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1589, *et seq.*, the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201, *et seq.*, the Maryland Wage and Hour Law ("MWHL"), Md. Code Ann., Lab & Empl. § 3-401, *et seq.*, the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code Ann., Lab. & Empl. § 3-501, *et seq.* and breach of contract under Maryland law. Pending before the Court is APC Defendants' Motion to Compel Arbitration as to Plaintiff Tatiana Cuenca-Vidarte. ECF No. 22. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2021). For the following reasons, APC Defendants' Motion to Compel Arbitration is granted.

I.      **BACKGROUND**[1]

A.  **J-1 Visa Au Pair Program**

Congress created the J-1 Visa program under the authority of the Mutual Education and Cultural Exchange Act of 1961, which "enable[s] the Government of the United States to increase mutual understanding between the people of the United States and the people of other countries by means of educational and cultural exchange[.]" 22 U.S.C. § 2451. One such J-1 Visa program is the au pair program, which is codified at 22 C.F.R. § 62.31(a).

The au pair program is operated by the Department of State and affords foreign nationals with "the opportunity to live with an American host family and participate directly in the home life of the host family." *Id.* The Department of State facilitates the au pair program by designating certain entities to act as sponsors, *id.* § 62.31(c), and the sponsors are responsible for not only selecting the au pairs, *id.* § 62.31(d), but also adequately screening and selecting host families, *id.* § 62.31(h), and eventually placing the au pair in the home of host families, *id.* § 62.31(e). Defendant APC is one such sponsor designated by the Department of State. ECF No. 6 ¶¶ 21–22.

The program specifically provides individuals between the ages of 18 and 26, who have a secondary school education (or equivalent) and are proficient in English, *id.* § 62.31(d), with the opportunity to be placed with a host family and provide child-care services in exchange for monetary compensation, *id.* § 62.31(j)(1), boarding, *id.* § 62.31(e)(6), and access to no less than six semester hours of formal education credit, *id.* § 62.31(k)(1). Program participation is limited to one year, *id.* § 62.31(c)(1), and au pairs are to be provided two-weeks paid vacation over the duration of their year in the program. *Id.* § 62.31(j)(4).

---

[1] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

### B.  Cuenca-Vidarte and the APC Agreements

In 2017, Plaintiff Cuenca-Vidarte paid 5,200,000 Colombian pesos, or approximately $1,400 U.S. dollars, to participate in the J-1 Visa program through APC Defendants, which was described to Plaintiff as "a wonderful opportunity to live and work in the United States while taking classes and improving her English-speaking skills." ECF No. 6 ¶ 44. Plaintiff signed her first agreement with APC Defendants on September 4, 2017, ECF No. 22-1, and she signed her second agreement[2] on September 27, 2018, ECF No. 22-2 (the "APC Agreements").[3]

The 2017 APC Agreement and 2018 APC Agreement contain virtually identical language. First, both agreements open with the statement that "This AuPairCare Au Pair Agreement (the 'Agreement') is entered into between AuPairCare, a California Corporation and 'Au Pair' **Tatiana Cuenca Vidarte** of Palmira, Colombia[.]" ECF No. 22-1 at 2; ECF No. 22-2 at 2 (emphasis in original). Second, both agreements include a California choice of law provision. The 2017 Agreement states that "[t]his Agreement shall be deemed to have been made in the State of California, U.S., and its validity, construction, breach, performance, and interpretation shall be governed by the laws of the State of California, U.S." ECF No. 22-1 ¶ 82. The 2018 Agreement breaks this language out in a distinct section entitled "Choice of Law" and likewise states that "[a]ny dispute or claim rising out of this Agreement, as described above, shall be governed by the laws of the State of California, U.S.A., including without limitation, this Agreement's validity, construction, breach, performance, and interpretation." ECF No. 22-2 ¶ 88. Third, both agreements include very similar arbitration provisions, except for a significant

---

[2] Defendants Michaele Samuel and Adam Ishaeik are not covered by the arbitration agreement.

[3] The Court "may consider documents attached to the complaint, as well as documents attached to the motion . . . if they are integral to the complaint and their authenticity is not disputed." *Sposato v. First Mariner Bank*, No. 12-cv-1569-CCB, 2013 WL 1308582, at *2 (D. Md. Mar. 28, 2013).

change with respect to the arbitration provider clause. The 2017 APC Agreement's arbitration provision states the following in full:

> The parties to the Agreement acknowledge and agree that any dispute or claim arising out of this Agreement, including, but not limited to any resulting or related transaction or the relationship of the parties, shall be decided by neutral, exclusive and binding arbitration in San Francisco, California, U.S. **before an arbitration provider selected by AuPairCare**, upon the petition of either party.
>
> In such proceeding, the parties may utilize subpoenas and have discovery as provided in California Code of Civil Procedure Sections 1282.6, 1283 and 1283.05. The decision of the arbitrator shall be final and binding and may be enforced in any court of competent jurisdiction. Au Pair agrees that California is a fair and reasonable venue for resolution of any such dispute and it submits to jurisdiction of the Courts of the State of California because, among other reasons, this agreement was negotiated in large part in California, and AuPairCare is domiciled in California.
>
> In the event that the arbitration clause is deemed void or inapplicable, each party expressly consents to and submits to the personal jurisdiction of the federal or state court(s) of San Francisco County, California, U.S. In any action, including arbitration, brought for breach of this Agreement, the prevailing party shall be entitled to recover reasonable attorney's fees and costs, including but not limited to the costs of arbitration[.]

ECF No. 22-1 ¶ 82 (emphasis added). The 2018 APC Agreement states the following in full:

> The parties to the Agreement acknowledge and agree that any dispute or claim arising out of this Agreement, including but not limited to any resulting or related transaction or the relationship of the parties, shall be decided by neutral, exclusive, binding, private, and confidential arbitration in San Francisco, CA, U.S.A., where AuPairCare, Inc. is headquartered. **The arbitration shall be administered by a neutral arbitrator provided by American Arbitration Association ("AAA"), who shall be selected pursuant to AAA's Commercial Arbitration Rule.** In such proceeding, the arbitration shall be conducted pursuant to AAA's Commercial Arbitration Rules and the parties may utilize subpoenas and discovery as provided in California Code of Civil Procedure Sections 1282.5, 1283, and 1283.05. Either party may appear telephonically at the arbitration. The decision of the arbitrator shall be final and binding and may be enforced in any court of competent jurisdiction.

ECF No. 22-2 ¶ 86 (emphasis added). Most notably, the 2018 APC Agreement no longer has the language stating that APC exclusively selects the arbitration provider, as it is replaced with language stating that "[t]he arbitration shall be administered by a neutral arbitrator provided by American Arbitration Association ("AAA"), who shall be selected pursuant to AAA's

Commercial Arbitration Rule." *Id.* Further, the arbitration provision in the agreements is located

on the pages preceding Plaintiff's signatures, ECF No. 22-1 at 9; ECF No. 22-2 at 9–10, and both

agreements state the following above her signature:

> Please read the following statements carefully. Your signature below indicates you have read
> and understood these statements and that you agree to them:
> - I am capable of reading and understanding this Agreement in English.
> - I have had the opportunity to ask questions and obtain advice, to ensure I understand
>   this Agreement in its entirety.
> - I accept the terms of this entire Agreement and understand that it is legally binding.
> - I do not rely on any promises, statements, or representations that are not expressly
>   stated in this Agreement.
> - No alteration of the terms of this Agreement will be valid unless approved by
>   AuPairCare in writing.
> - I have retained a copy of this Agreement for my own records.

ECF No. 22-1 at 10; ECF No. 22-2 at 11.

### C. Cuenca-Vidarte's Factual Allegations[4]

In November 2017, after completing the application and matching process, Plaintiff

arrived in the United States and APC Defendants placed her in the home of Michaele C. Samuel

and Adam Ishaeik (the "Samuel Defendants"). ECF No. 6 ¶ 45. Plaintiff alleges that, pursuant to

the contract, she was "to provide childcare and child-related tasks for the Samuel family," which

included general supervision, meal preparation, and light housekeeping tasks as it related to the

children. *Id.* ¶ 46. Plaintiff's contract "explicitly excluded 'heavy housework… or other non-

child related labor for the household.'" *Id.* ¶ 47 (ellipses in original). Plaintiff alleges that, in

accordance with federal law, she was not to work more than 45 hours per week, or ten hours a

day, and that she was to receive a "minimum of one-and one-half days off every week and one

---

[4] The instant Motion to Compel Arbitration, ECF No. 22, seeks to compel only Plaintiff Tatiana Cuenca-Vidarte to
arbitration, not Plaintiff Sandra Peters. *Id.* Plaintiff Peters only brings claims against the Samuel Defendants, not the
APC Defendants. *See* ECF No. 6 ¶¶ 107–155. Therefore, the factual allegations set forth in this background section
are limited to Plaintiff Cuenca-Vidarte.

full weekend off," *id.* ¶ 48, but that despite the parties agreeing to these terms, the Samuel

Defendants required Plaintiff "to do heavy housework and to work far in excess of the maximum

hours set by law." [5] *Id.* ¶ 49. Plaintiff further alleges that the Samuel Defendants "exerted

extreme control over Plaintiff" by "monitoring her every move through a network of surveillance

cameras placed throughout the house and front and back yards" and that they would berate and

reprimand Plaintiff if she failed to comply with their "highly regimented daily schedule of

childcare and house cleaning." *Id.* ¶ 50. Specifically, Plaintiff alleges that the Samuel Defendants

required her to perform "heavy non-childcare-related work" including the following: (1)

mopping and cleaning windows, doors, and light switches, (2) deep cleaning the oven,

microwave, tables, cabinets, refrigerator, and stove, and (3) cleaning using harsh cleaning

supplies and bleach, sometimes without proper materials such as gloves, which led to dryness

and cracking in Plaintiff's hands and her development of "chemical sensitivity to cleaning

supplies that persists to this day." *Id.* ¶ 51.

When Plaintiff objected to these additional cleaning tasks, the Samuel Defendants

"retaliated" against Plaintiff by restricting her access to certain areas of their home including, for

example, access to the guest bathroom, *id.* ¶ 52. Plaintiff alleges that the Samuel Defendants

justified Plaintiff's need to complete these additional cleaning tasks by "manipulating" Plaintiff

"under the guise of telling her she was a 'family member.'" *Id.* ¶ 53. Plaintiff contends that,

---

[5] Plaintiff contends that host families directly supervise au pairs within the home and that, as part of the host family's contract with the sponsor, it is the host family that determines the au pairs daily schedule and approves her vacation time. ECF No. 6 ¶ 31. Although the host family determines the au pair's day-to-day duties, Plaintiff contends that "Defendants AuPairCare acted jointly as employers with the Samuel family," *id.* ¶ 32, as APC Defendants recruited and hired Plaintiff, including requiring her to participate in 32 hours of unpaid, pre-placement training, *id.* ¶35, set Plaintiff's salary and determined the method of payment and any deductions for food, lodging, and provided health insurance, *id.* ¶ 36, and that both set and promulgated work rules, including those for her compensation, benefits, and hours, *id.* ¶ 37. Plaintiff further contends that APC Defendants "effectively controlled the relationship between Plaintiff and any host family because they "had the power to fire and remove Plaintiff Cucenca-Vidarte from her matched host family and force her to repatriate to her home country at Defendants AuPairCares's discretion[.]" *Id.* ¶ 38.

rather than being treated as a family member, "she was treated as a servant who had no choice but to obey orders and to undertake any tasks assigned" by the Samuel Defendants. *Id.* Relatedly, Plaintiff makes several allegations with respect to the Samuel Defendants' restriction of Plaintiffs' access to food while she was an au pair in their home. Specifically, Plaintiff alleges that (1) they only provided her with a limited variety of cheap, mostly processed food items, such as "chicken nuggets, meatballs, milk, beans, rice, and bread," (2) she was told by the Samuel Defendants that she could not eat the fresh fruits and vegetables in the home, and (3) Plaintiff could not drink the filtered water in the home. *Id.* ¶ 54. Moreover, Plaintiff was only allowed to use the kitchen to prepare her meals during her 'designated time' of either before 9:00 am or after 9:00 pm, as she was "strictly prohibited" from using the kitchen at the same time as the Samuel Defendants, and her ability to "have a cooked meal after 9:00 pm was conditioned on her continued interaction" with them. *Id.* ¶ 55. Specifically, if Plaintiff wanted to eat with the Samuels Defendants, "she had to continue to interact with the Samuel's family and watch the family while Dr. Samuel cooked," which Plaintiff alleges "only further extended her [working] hours." *Id.* Then, after dinner, Plaintiff had to wash the dishes and cookware by hand, even though there was a dishwasher at the home, and she usually also cleaned the stove and dining room table and swept the floor. *Id.*

Plaintiff additionally alleges that the Samuel Defendants went to "great lengths" to control her, including, with respect to her personal hygiene and limiting Plaintiff to 15-minute showers, *id.* ¶ 56, micro-managing her work, by requiring Plaintiff to re-do cleaning tasks, *id.* ¶ 59, and telling Plaintiff when and where she could go. *See id.* ¶ 61. For example, Plaintiff alleges that the Samuel Defendants often forbade her from using their car, despite requiring Plaintiff to receive her driver's license, and that they required her to "inform them of who she was meeting

with and what she was going to do." *Id.* Plaintiff alleges that on one occasion, Dr. Samuel insisted on driving Plaintiff to the home of another host family to "evaluate the family" before she would give Plaintiff permission to visit the au pair in that home. *Id.*

Plaintiff also alleges that the Samuel Defendants' efforts to control her also extended to Plaintiff's ability to use her vacation time. She contends that she was unable to use her ten days of paid vacation because Dr. Samuel asked her to use her second week of vacation to accompany the family to Grenada, though she was told that "she would not be required to work much, if at all . . . and if she did work, she would be paid extra." *Id.* ¶ 57. Feeling pressured and "deciding to go because she had no money and wanted to go on a vacation," Plaintiff accompanied the Samuel Defendants on the trip and was required to work every day, with no privacy, and had to share a room with the family. *Id.* Plaintiff had to "clean baby bottles, prepare food, and dress the children," and she also had to watch the children alone on several occasions. *Id.* Plaintiff alleges that she was not paid for her work in Grenada. *Id.*

The Samuel Defendants also "regularly belittled and berated" Plaintiff by calling her "stupid, dirty, useless, and slow, and told her that there was something wrong with her," which Plaintiff alleges caused her to develop anxiety and low self-esteem. *Id.* ¶ 58. Further, the Samuel Defendants "repeatedly" directed Plaintiff "to be grateful because they allowed her to continue working and living with them in spite of her 'bad work.'" *Id.* ¶ 60. Plaintiff contends that the Samuel Defendants often responded to her protests and complaints with the "veiled threat of deportation," *id.* ¶ 62, because the Samuel Defendants knew that Plaintiff's right to seek a new placement or "rematch" with a new family was contingent upon her receipt of a positive recommendation from them. *Id.* Therefore, they often threatened to give Plaintiff a "terrible reference" if she refused "to comply with their every demand, including their demands that she

work in excess of the weekly 45-hours set by the contract." *Id.* ¶¶ 63, 65. In support of this threat, Plaintiff alleges that Dr. Samuel informed Plaintiff about one of her previous au pairs who could not rematch with a new family and was forced to return to Colombia, which Plaintiff alleges scared her and made her feel "compelled to continue working for the Samuel Defendants." *Id.* ¶ 63.

Plaintiff contends that APC Defendants failed to readily support her in addressing her situation with the Samuel Defendants even though she made "numerous attempts" to reach out to them. *Id.* ¶ 64. Plaintiff alleges that the Samuel Defendants eventually acted on their threats by interfering with her ability to rematch with a new family. *Id.* ¶ 66. Plaintiff alleges that the Samuel Defendants "blocked her access to the internet and gave her negative references." *Id.* Plaintiff interviewed with three different potential host families and although they expressed interest in hiring her, "each family ultimately declined after talking to the Samuel Defendants." *Id.* ¶ 67.

Plaintiff alleges that as a result of her experiences with the Samuel Defendants, she "experienced a high level of stress and overall lack of nutrition that caused her to lose hair and gain weight." *Id.* ¶ 68. During her time working for the Samuel Defendants, between November 7, 2017 and September 28, 2018, Plaintiff alleges that she was paid $195.75 per week, *id.* ¶¶ 94, 69, and that she did not receive any overtime compensation for the hours she worked beyond 40 hours per week, *id.* ¶ 69, nor did she receive a reimbursement for $395.15 in transportation costs she was set to receive per her contract with APC Defendants. *Id.* ¶ 70.[6]

### D.  Procedural Background

---

[6] Plaintiff also alleges she was required to spend $31.14 of her salary to replace a 100-piece counting toy "when a single piece went missing." ECF No. 6 ¶ 71.

Plaintiffs filed a Complaint, on June 22, 2020, ECF No. 1, and then filed the First

Amended Complaint on July 1, 2020, ECF No. 6.[7] APC Defendants filed the pending Motion to

Compel Arbitration on September 23, 2020, ECF No. 22. Plaintiff Cuenca-Vidarte filed an

Opposition to Defendants' Motion to Compel Arbitration on November 16, 2020, ECF No. 28,

and Defendants filed a Reply in Support of Defendants' Motion to Compel Arbitration on

December 7, 2020, ECF No. 30.

## II.    STANDARD OF REVIEW

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16, "represents 'a liberal federal

policy favoring arbitration agreements.'" *Murray v. United Food & Commercial Workers Intll*

*Union*, 289 F.3d 297, 301 (4th Cir. 2002) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury*

*Constr. Corp.*, 460 U.S. 1, 24–25 (1983)). "The strength of this well-established policy favoring

the enforcement of valid arbitration agreements, however, does not end our inquiry." *Id.* at 302.

"[E]ven though arbitration has a favored place, there still must be an underlying agreement

between the parties to arbitrate." *Adkins*, 303 F.3d at 501 (quoting *Arrants v. Buck*, 130 F.3d 636,

640 (4th Cir. 1997)). Accordingly, before compelling an unwilling party to arbitration, a court

must "engage in a limited review to ensure that the dispute is arbitrable—i.e., that a valid

agreement to arbitrate exists between the parties and that the specific dispute falls within the

substantive scope of that agreement." *Murray*, 289 F.3d at 302 (quoting *Hooters of Am., Inc. v.*

*Phillips*, 173 F.3d 933, 937 (4th Cir. 1999)).

A litigant may compel arbitration under the FAA if he can demonstrate "(1) the existence

of a dispute between the parties, (2) a written agreement that includes an arbitration provision

---

[7] In the First Amended Complaint, ECF No. 6, Plaintiff Cuenca-Vidarte alleges Counts I–V against both the APC
Defendants and the Samuel Defendants. *Id.* ¶¶ 107–155. Plaintiff Sandra Peters, who is not the subject of the
pending Motion to Compel, alleges Counts I–V against only the Samuel Defendants. *Id.*

which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute." *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500–01 (4th Cir. 2002) (quoting *Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991)); *see also* 9 U.S.C. § 2 ("[A]n agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."). Regarding the second element, "[w]hether a party agreed to arbitrate a particular dispute is an issue for judicial determination to be decided as a matter of contract." *Johnson v. Circuit City Stores*, 148 F.3d 373, 377 (4th Cir. 1998) (citing *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648–49 (1986)); *Chorley Enters., Inc. v. Dickey's Barbecue Rests., Inc.*, 807 F.3d 553, 563 (4th Cir. 2015), *cert. denied*, 136 S. Ct. 1656 (2016) (finding courts compel arbitration "if (i) the parties have entered into a valid agreement to arbitrate, and (ii) the dispute in question falls within the scope of the arbitration agreement"). The Court must, however, "avoid reaching the merits of arbitrable issues." *Id.* 939 n.9 (citing *Drivers, Chauffeurs, etc. v. Akers Motor Lines*, 582 F.2d 1336, 1342 (4th Cir. 1978)).

Where the parties dispute the validity of an arbitration agreement, "[m]otions to compel arbitration . . . are treated as motions for summary judgment." *Rose v. New Day Fin., LLC*, 816 F. Supp. 2d 245, 251 (D. Md. 2011). Therefore, such motions "shall [be] grant[ed] . . . if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering the motion, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249

(1986). Moreover, the Court must "view the evidence in the light most favorable to . . . the

nonmovant, and draw all reasonable inferences in her favor," *Dennis v. Columbia Colleton Med.*

*Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but it also must abide by the "affirmative obligation

of the trial judge to prevent factually unsupported claims and defenses from proceeding to

trial," *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003)

(quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

## III.   DISCUSSION

With respect to the threshold question of whether Defendants may compel arbitration

under the FAA, it is clear that there is a dispute between the parties, that the written APC

Agreements contain an arbitration provision, *see* ECF No. 22-1 ¶ 82; ECF No. 22-2 ¶ 86, and

that Plaintiff opposes arbitration, *see generally* ECF No. 28.

The FAA operates to enforce an arbitration provision included in "a contract evidencing a

transaction involving commerce." 9 U.S.C. § 2. "The Supreme Court has held that the FAA

applies to employment contracts if the employment affects interstate commerce."[8] *CarMax Auto*

*Superstores California LLC v. Hernandez*, 94 F. Supp. 3d 1078, 1100 (C.D. Cal. 2015) (citing

*Herrera v. CarMax Auto Superstores California, LLC*, No. CV–14–776–MWF (VBKx), 2014

WL 3398363, *3 (C.D. Cal. July 2, 2014) ("The FAA applies to written arbitration agreements in

'contract[s] evidencing a transaction involving commerce.' An employment contract including

an agreement to arbitrate can be subject to the FAA, if it is not expressly exempted by the FAA

and if the employment affects interstate commerce[.]")). In the instant case, Plaintiff participated

as an au pair for APC, which is headquartered in California, but recruits, trains, and places

---

[8] APC Defendants deny that Plaintiff was its employee, ECF No. 22 at 6, but APC Defendants, and now the Court, analyze this threshold question of the applicability of the FAA on this assumption as Plaintiff alleges in the First Amended Complaint, ECF No. 6, that she was their employee. *Id.* ¶¶ 4, 28–43, 120.

foreign individuals in au pair positions across the United States, ECF No. 6 ¶ 4, and Plaintiff

herself worked on the East Coast, "specifically in the District of Columbia- Maryland-Virginia

area." ECF No. 28 at 7. The connection to interstate commerce is evident. *See, e.g.*, *Montes v.*

*San Joaquin Community Hospital*, No. 1:13–cv–01722–AWI–JLT, 2014 WL 334912, *5 (E.D.

Cal. Jan. 29, 2014) (finding that FAA governed employment contract between a plaintiff and a

hospital because the hospital's activities including caring for patients and obtaining supplies

outside California were within interstate commerce). As such, Plaintiff's contracts with APC

involved interstate commerce and the FAA is applicable to the arbitration agreements.

### A.  The Dispute and Scope of the Arbitration Agreement

The Court next addresses whether the dispute now at issue falls within the scope of the

arbitration agreement. "Absent some ambiguity in the agreement, however, it is the language of

the contract that defines the scope of disputes subject to arbitration." *E.E.O.C. v. Waffle House,*

*Inc.*, 534 U.S. 279, 289 (2002) (citing *Mastrobuono v. Shearson Lehman Hutton*, Inc., 514 U.S.

52, 57 (1995)). Arbitration clauses that use language such as "any controversy or claim *arising*

*out of or relating to* this Agreement" are viewed as broad in scope. *See Prima Paint Corp. v.*

*Flood & Conklin Mfg. Co.*, 388 U.S. 395, 398 (1967) (emphasis added); *see also Schoenduve*

*Corp. v. Lucent Techs., Inc.*, 442 F.3d 727, 732 (9th Cir. 2006); *Valentine Sugars, Inc. v. Donau*

*Corp.*, 981 F.2d 210, 213 n.2 (5th Cir. 1993) (noting that clauses including "relating to or arising

out of" an agreement are broad and "they intend the clause to reach all aspects of the

relationship.").

Here, both APC Agreements at issue contain the broad "arising out of" language, *see*

ECF No. 22-1 ¶ 82; ECF No. 22-2 ¶ 86, specifically with respect to "any resulting or related

transaction or the relationship of the parties." *Id.* Therefore, the arbitration provisions apply

broadly and would indeed encompass Plaintiff's foundational allegation that she was employed by the APC Defendants, *see* ECF No. 6 ¶¶ 4, 28–43, 120; *see also* ECF No. 22-1 ¶ 10, which goes directly to the relationship of the parties. Moreover, such language would also encompass other aspects of the relationship between Plaintiff and the APC Defendants including her responsibilities as a participant in the J-1 Visa au pair program, *see* ECF No. 22-1 ¶¶ 20–26; ECF No. 22-2 ¶ 11–19, the minimum wage Plaintiff was owed under this program, *see* ECF No. 22-1 ¶ 40–48; ECF No. 22-2 ¶ 42–50, and Plaintiff's allocated vacation time, *see* ECF No. 22-1 ¶ 42; ECF No. 22-1 ¶ 44. Plaintiff alleges violations of federal and state labor laws, as well as breach of contract, based on facts that "touch" each of these areas. *See Simula, Inc. v. Autoliv, Inc.,* 175 F.3d 716, 721 (9th Cir. 1999) ("To require arbitration [a plaintiff's] allegations need only 'touch matters' covered by the contract containing the arbitration clause and all doubts are to be resolved in favor of arbitrability." (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 624 n.13 (1985))). Thus, Plaintiff's claims necessarily "fall[] within the scope of the arbitration agreement." *See Chorley Enters., Inc.*, 807 F.3d at 563.

## B. Validity of the Arbitration Agreement

"The issue [of] whether a dispute is arbitrable presents primarily a question of contract interpretation, requiring that we give effect to the parties' intentions as expressed in their agreement." *Chorley Enters., Inc.,* 807 F.3d at 563 (citation and internal quotation marks omitted). "In determining the parties' intent, we apply ordinary state law principles governing the formation of contracts." *Id.* Plaintiff does not contest that the arbitration agreement is applicable to this lawsuit. *See generally* ECF No. 28. But Plaintiff does argue that the arbitration agreement contained in the contracts is both procedurally and substantively unconscionable and, therefore, should not be enforced. *Id.* at 1.

The parties agree that under the choice-of-law provision in the APC agreements, California law governs the determination of whether the agreement is valid. *See* ECF No. 22 at 7; ECF No. 28 at 2. "California law, like federal law, favors enforcement of valid arbitration agreements." *Armendariz v. Found. Health Psychcare Servs., Inc.*, 6 P.3d 669, 678 (Cal. 2000). In fact, "the strong public policy of th[e] state [of California] favoring arbitration as a means of dispute resolution requires courts to indulge every intendment to give effect to such proceedings." *Martinez v. Scott Specialty Gases, Inc.*, 100 Cal. Rptr. 2d 403, 409–10 (Cal. Ct. App. 2000); *see also Coast Plaza Doctors Hosp. v. Blue Cross of Cal.*, 99 Cal. Rptr. 2d 809, 816 (Cal. Ct. App. 2000) ("California has a strong public policy in favor of arbitration and any doubts regarding the arbitrability of a dispute are resolved in favor of arbitration.") (citation omitted). Moreover, "[t]he party seeking arbitration bears the burden of proving the existence of an arbitration agreement, and the party opposing arbitration bears the burden of proving any defense, such as unconscionability." *Pinnacle Museum Tower Assn. v. Pinnacle Mkt. Dev. (US), LLC*, 282 P.3d 1217, 1224–25 (Cal. 2012).

In *Beltran v. AuPairCare, Inc.*, 907 F.3d 1240, 1252 (10th Cir. 2018), the Tenth Circuit analyzed agreements nearly identical to those before this Court. The *Beltran* court held that the arbitration provision was unconscionable, but that the provision could be stricken and the agreement remained enforceable. *Id.* at 1252. Finding the Tenth Circuit's reasoning persuasive, this Court's analysis largely tracks that of the *Beltran* court and reaches the same conclusion.

### 1. Procedural Unconscionability

Under California law, "[u]nconscionability consists of both procedural and substantive elements." *Pinnacle Museum*, 282 P.3d at 1232. While both must be shown, "they need not be present in the same degree and are evaluated on a sliding scale." *Id.* (internal quotations and

citations omitted). "[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Id.*

"Procedural unconscionability 'addresses the circumstances of contract negotiation and formation, focusing on oppression or surprise due to unequal bargaining power.'" *Capili v. Finish Line, Inc.*, 116 F. Supp. 3d 1000, 1005 (N.D. Cal. 2015) (quoting *Pinnacle Museum*, 282 P.3d at 1232). "Oppression occurs where a contract involves lack of negotiation and meaningful choice, surprise where the allegedly unconscionable provision is hidden within a prolix printed form." *Morris v. Redwood Empire Bancorp*, 27 Cal. Rptr. 3d 797, 805 (Cal. Ct. App. 2005) (quotation omitted).

And though "[u]nconscionability analysis begins with an inquiry into whether the contract is one of adhesion," *Armendariz*, 6 P.3d at 689, an adhesive contract being one that is "imposed and drafted by the party of superior bargaining strength, [and] relegates to the subscribing party only the opportunity to adhere to the contract or reject it," *Sonic-Calabasas A, Inc. v. Moreno*, 311 P.3d 184, 194 (Cal. 2013) (internal quotations and citations omitted), the "recognition of the . . . agreement as an adhesion contract . . . heralds the beginning, not the end, of our inquiry into its enforceability." *Morris*, 27 Cal. Rptr. at 807. This is because, "[b]y itself, [an adhesive agreement] and arbitration provision establish only a modest degree of procedural unconscionability." *Carbajal v. CWPSC, Inc.*, 199 Cal. Rptr. 3d 332, 345 (Cal. Ct. App. 2016). With respect to oppression, Plaintiff argues that the APC Agreements, "presented in a take-it-or-leave-it manner," are "by their nature oppressive" because they were pre-prepared with more than 80 terms that Plaintiff "had to agree to in order to accept the position" and were computer generated, which did not allow Plaintiff to make many changes. ECF No. 28 at 3. However, this

alone establishes only "a modest degree of procedural unconscionability." *Carbajal,* 199 Cal.

Rptr. 3d at 345. This oppression component of the procedural unconscionability "may be

defeated, if the complaining party has a meaningful choice of reasonably available alternative

sources of supply from which to obtain the desired goods and services free of the terms claimed

to be unconscionable." *Dean Witter Reynolds, Inc. v. Superior Court*, 259 Cal. Rptr. 789, 797

(Cal. Ct. App. 1989).

Here, Plaintiff had meaningful choices. She participated in a J-1 sponsored cultural

exchange program, where the stated Congressional purpose is to "increase mutual understanding

between the people of the United States and the people of other countries by means of

educational and cultural exchange," 22 U.S.C. § 2451. Congress limited participation in the

program to a year-long term, *see id.* § 62.31(c)(1), and APC was just one of several State

Department sponsors of the J-1 Visa program from which Plaintiff could seek to participate in

this type of cultural exchange program. Thus, as the *Beltran* court found, "any procedural

unconscionability from the adhesive nature of the contract is at most modest." 907 F.3d at 1254.

Plaintiff's argument that she is a young, non-native English speaker who is

unsophisticated in "contracting in the United States," ECF No. 28 at 3, likewise fails to

significantly increase the procedural unconscionability of the APC Agreements for several

reasons. First, Plaintiff was not a minor at the time she entered into the contract because, as

Plaintiff acknowledged, the program was limited to "foreign nationals between the ages of 18

and 26." ECF No. 6 ¶ 19. Second, Plaintiff, by signing the 2017 and 2018 APC Agreements,

affirmatively represented that she was "capable of reading and understanding this Agreement in

English" and that she "had the opportunity to ask questions and obtain advice, to ensure [she]

under[stood] this Agreement in its entirety." ECF No. 22-1 at 10; ECF No. 22-2 at 11. Even if

Plaintiff now contends that she did not fully understand the Agreements at the time she signed

them, in similar circumstances California state courts have found that "[k]nowing her own

inexperience, she signed" the APC Agreements anyway, and any such oppression "was self-

imposed."[9] *West v. Henderson*, 278 Cal. Rptr. 570, 575 (Cal. Ct. App. 1991), *overruled on other*

*grounds by Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Assn.*, 291 P.3d 316

(Cal. 2013).

Plaintiff additionally argues that the procedural unconscionability of the APC

Agreements is "compounded by the element of surprise" because, for example, "the arbitration

clause in the employment agreement was buried at the end of the agreement, in paragraph 82,

and was not highlighted in any way[.]" ECF No. 28 at 4. The au pair plaintiffs in *Beltran*

advanced similar arguments, and the court concluded that "any surprise from the contract is

negligible." *Beltran*, 907 F.3d at 1256. This Court agrees. First, while the 2017 APC

Agreement's arbitration provision does not have a separate heading, *see* ECF No. 22-1 ¶ 82, the

2018 APC Agreement does include the arbitration provision under a section entitled "M. Choice

of Law, Venue, Class Action Waiver and Resolution of Disputes through Arbitration" and a

subsection entitled "86. Resolution of Disputes Through Arbitration." ECF No. 22-2 ¶ 86.

Though the 2018 APC Agreement included a separate heading, "there is no requirement in

California law that it have one." *See Beltran*, 907 F.3d at 1256 (citing *Sanchez v. Valencia*

*Holding Co.*, 353 P.3d 741, 751 (Cal. 2015) ("Any state law imposing such an obligation [to call

the arbitration provision to a party's attention] would be preempted by the FAA."). Moreover,

---

[9] That Plaintiff now contends that "[t]he only contract that [she] received in Spanish was with Global Exchange" and that "[t]his contract was not the same as the contract signed with Defendants AuPairCare" ECF No. 28-1 ¶ 8, does not change the Court's analysis because Plaintiff, by signing the agreements, agreed that she was capable of reading and understanding the agreements in English, and that she had the opportunity to ask questions and obtain advice. *See* ECF No. 22-1 at 10; ECF No. 2202 at 11.

the 2017 and 2018 APC Agreements are ten and eleven pages, respectively, and the arbitration provision appears on the page preceding the last page, before the signature block, in which Plaintiff agreed that she was capable of both reading and understanding the agreement. *See* ECF No. 22-1 at 9–10; ECF No. 22-2 at 9–11. *See, e.g., Harris v. TAP Worldwide, LLC*, 203 Cal. Rptr. 3d 522, 530 (Cal. Ct. App. 2016) ("The fact that defendant either chose not to read or take the time to understand these provisions is legally irrelevant."); *Alonso v. AuPairCare, Inc.*, No. 3:18-cv-00970-JD, 2018 WL 4027834, at *3 (N.D. Cal. Aug. 23, 2018) ("It was not surprising or misleading for APC to place the arbitration provision under 'Other Terms and Conditions.'" (citation omitted)).[10]

In line with the *Beltran* Court's holding, the APC Agreements are, to a moderate degree, procedurally unconscionable due to their status as adhesive contracts. However, Plaintiff's status as a young, non-native English speaker unsophisticated in U.S. contract law did not increase the procedural unconscionability "to any significant degree," *Beltran*, 907 F.3d at 1256, and because the arbitration agreement was not "buried at the end of the agreement," ECF No. 28 at 4, the Court is unable to find any element of surprise in the Agreements. Further, where Plaintiff signed the Agreements affirming that she was capable of reading and understanding the agreements in English, no procedural unconscionability can attach due to her status as a non-native English speaker. And because Plaintiff had reasonable alternatives, through the other State Department J-1 visa program sponsors, these considerations also weigh against finding additional procedural unconscionability. As such, the APC Agreements suffer, at most, from "moderate" procedural unconscionability. *See Beltran*, 907 F.3d at 1256.

---

[10] Plaintiff's additional arguments that (1) the arbitration clause "does not explain what rights the au pair is giving up" and that (2) the contract does not provide Plaintiff with the mechanism to commence arbitration, ECF No. 28 at 4–5, also fail to support her claim of procedural unconscionability because Plaintiff fails to cite any case law showing that Defendants needed to include such language in the arbitration clause or in the contract as a whole.

## 2.   Substantive Unconscionability

"Substantive unconscionability addresses the fairness of the term in dispute. The focus of the inquiry is whether the term is one-sided and will have an overly harsh effect on the disadvantaged party. Thus, mutuality is the paramount consideration when assessing substantive unconscionability." *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 998 (9th Cir. 2010) (internal quotations and citations omitted).

Plaintiff argues that the arbitration clause is substantively unconscionable for three reasons: (1) it contains "an improper fee shifting mechanism that grants to the prevailing party 'attorney's fees and costs, including but not limited to the costs of arbitration,'" (2) "it gives APC the exclusive right to choose the arbitration provider," and (3) it requires that the dispute be resolved by arbitration in San Francisco, California. ECF No. 28 at 6–8. The Court will address each argument in turn.

### a.   Fee Shifting Mechanism

The fee shifting clause in the 2017 APC Agreement states in full that: "In any action, including arbitration, *brought for breach of this Agreement*, the prevailing party shall be entitled to recover reasonable attorney's fees and costs, including but not limited to the costs of arbitration [.]" ECF No. 22-1 ¶ 82 (emphasis added). Thus, Plaintiff is incorrect in her claim that the fee shifting clause at issue here "violate[s] a plaintiff's unwaivable rights under FLSA and may not be enforced." ECF No. 28 at 6. Based on a plain reading of this language, "by its own terms, the clause applies only to actions for breach of contract." *Beltran*, 907 F.3d at 1261. Therefore, the clause does not violate any unwaivable right, let alone an "unwaivable right under the FLSA," ECF No. 28 at 6, and Plaintiff does not attempt to argue that she has "unwaivable

rights" under her breach of contract claims. Thus, the case law cited by Plaintiff, *see id.*, is distinguishable and fails to support her argument.

### b. Arbitration Provider

Plaintiff argues that the arbitration provider clause in the 2017 APC Agreement is unconscionable because it provides the APC Defendants with the "exclusive right" to select this provider. ECF No. 28 at 7. APC Defendants respond that "the agreement is explicit that the dispute must be decided by 'neutral' arbitration," which is distinguishable from the *Chavarria v. Ralphs Grocery Co.* 733 F.3d 916, 924 (9th Cir. 2013) case cited by Plaintiff because, in that case, "there was no assurance of neutrality" and "the employer selected the arbitrator, not merely the arbitration provider." ECF No. 30 at 5–6. In *Beltran*, APC advanced similar arguments highlighting the requirement of "neutral arbitration" in the language of the agreements, 907 F.3d at 1257, but such arguments failed to convince the Tenth Circuit that the arbitration provider clause was not unconscionable. Such arguments are likewise unconvincing to this Court.

As the Tenth Circuit aptly put, "[t]here is no practical significance to the difference between allowing APC to select an arbitration provider and allowing it to select an arbitrator" because "nothing would prevent APC from selecting an arbitration provider with only one arbitrator favorable to APC or from selecting an arbitration provider that employs only biased arbitrators." *Id.* Likewise, the APC Defendants' reliance on the fact that the provision contains the requirement that any dispute or claim must be decided by neutral arbitration cannot "cure this defect." *Beltran*, 907 F.3d at 1257. The provision still gives APC Defendants authority to later determine the arbitrator using its own sense of "neutrality." Rather, "an arbitration provision may be acceptable if it requires an arbitrator to be selected from an identified neutral arbitration service" and "where the specific arbitration service is named in the agreement" such that the

weaker party can first assess whether the arbitration provider is neutral "before executing the agreement." *Id.*

This Court agrees with the *Beltran* court that 2017 APC Agreement's "clause allowing APC to select the unilaterally the arbitration provider has the same inherent unconscionability as allowing it to select the arbitrator," which carries a "high degree of substantive unconscionability."[11] *Id.*

### c. Forum Selection – San Francisco

Plaintiff last contends that the forum selection clause requiring that arbitration take place in San Francisco, California is unconscionable, primarily because (1) she is not a resident of California, (2) she has never worked there, (3) the "location of her service and abuse at issue" was not in California and because it is not reasonable for Plaintiff, as a "foreign worker with limited resources and connections" to be expected to "prepare, mount, and pay for such an arbitration" in "the location of the headquarters of a national employer." ECF No. 28 at 8.

At the time of enforcement of a forum selection clause, "it would be unfair, unjust, [and] unreasonable to enforce [it]" if arbitration "in the contractual forum will be so gravely difficult and inconvenient that [she] will for all practical purposes be deprived of [her] day in court." *See Aral v. Earthlink, Inc.*, 36 Cal. Rptr. 3d 229, 241–42 (2005), *abrogated on other grounds by AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 131 (2011). But in attempting to show that arbitration in the forum would be unreasonable, or "gravely difficult and inconvenient," "the additional expense and inconvenience attendant on the litigation . . . in a distant forum" is insufficient to show unreasonableness as "such matters are inherent in a reciprocal clause of this

---

[11] Plaintiff does not argue that the arbitration provider clause in the 2018 APC Agreement is unconscionable as Plaintiff only cites to the 2017 APC Agreement in her Opposition to Defendants' Motion to Compel Arbitration in support of this argument. *See* ECF No. 28 at 7; ECF No. 28-2.

type." *See Smith, Valentino & Smith, Inc. v. Superior Ct.*, 551 P.2d 1206, 1209 (Cal. 1976).

"Mere inconvenience or additional expense is not the test of unreasonableness[.]" *Id.* (internal

quotations and citation omitted). Therefore, Plaintiff's claims stemming from the fact that she is

a foreign worker with limited resources, who does not currently reside in California, are

insufficient under California law to establish unreasonableness of the forum selection provision,

particularly where Plaintiff "has made no factual showing" and where she "only made

conclusory statements that arbitrating in California would be 'unreasonable[.]'" *See Beltran*, 907

F.3d at 1260; *see also* ECF No. 28 at 7–8.[12]

Further, though Plaintiff additionally argues that she never worked in California, as her

work, and alleged abuse, took place in the District of Columbia-Maryland-Virginia area, Plaintiff

makes no argument that she did not have adequate notice of the forum selection provision. *See*

*generally* ECF No. 28. Indeed, Plaintiff signed the APC Agreements containing the forum

selection provision twice and she likewise affirmed that she was "capable of reading and

understanding the Agreement in English." ECF No. 22-1 at 10; ECF No. 22-2 at 11; *see also*

*Intershop Commc'ns v. Superior Ct.*, 127 Cal. Rptr. 2d 847, 855 (Cal. Ct. App. 2002) ("A forum

selection clause within an adhesion contract will be enforced as long as the clause provided

adequate notice to the [party] that he was agreeing to the jurisdiction cited in the contract.")

(internal quotations and citations omitted). Accordingly, Plaintiff has failed to show that the

---

[12] The cases cited by Plaintiff, *Bolter v. Superior Court*, 104 Cal. Rptr. 888, 894–95 (Cal. Ct. App. 2001) and *Comb v. PayPal, Inc.*, 218 F. Supp. 2d 1165, 1177 (N.D. Cal. 2002), are also distinguishable for two reasons. First, the parties in *Bolter* identified specific reasons why "litigat[ing] a dispute several thousand miles away" would be unreasonable, including that they were "small businesses," some of whom "ran the franchise out of [their] home" and were 'basically a one-man operation.' *Bolter*, 104 Cal. Rptr at 895. Plaintiff has made no such showing. Second, the parties in *PayPal* likewise provided specific examples to support their claim of unreasonableness such that the record supported a finding that it would be unreasonable to require "individual consumers from throughout the country to travel to one locale to arbitrate claims involving such minimal sums" of an average of $55.00.

forum selection clause is unreasonable, therefore the Court finds that the clause is not unconscionable.

### 3. Severability

This Court has found that both APC Agreements have moderate procedural unconscionability, due to the adhesive nature of the Agreements, and that the 2017 APC Agreement has high substantive unconscionability, due to the arbitration provider clause. Therefore, the APC Agreements are unconscionable. *See Beltran*, 907 F.3d at 1262. The Court must now address whether the arbitration provider clause in the 2017 APC Agreement is severable from the remainder of the agreement.

Under Cal. Civ. Code § 1670.5(a), after finding that a contract is unconscionable, a court "may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result." As the Supreme Court of California noted, "the statute appears to give a trial court some discretion as to whether to sever or restrict the unconscionable provision or whether to refuse to enforce the entire agreement . . . [but] it also appears to contemplate the latter course only when an agreement is 'permeated' by unconscionability." *Armendariz v. Found. Health Psychcare Servs., Inc.*, 6 P.3d 669, 695 (Cal. 2000). Thus, "[t]he overarching inquiry is whether "'the interests of justice . . . would be furthered'" by severance." *Id.* (citing *Beynon v. Garden Grove Medical Group*, 161 Cal. Rptr. 146, 155 (Cal. Ct. App. 1980)). The Supreme Court of California has found that two factors are to be considered when determining whether severance of an unlawful provision is possible: (1) "whether the arbitration agreement contains more than one unlawful provision" and (2) whether "there is [a] single provision a court can strike or restrict in order to remove the unconscionable taint from the

agreement." *Id.* at 775. And notably, California courts have repeatedly recognized that unconscionable arbitration provider clauses can be severed. *See id.* (citing *Graham v. Scissor-Tail, Inc.*, 623 P.2d 165, 180 (Cal. 1981)); *Lewis v. Lynch, Pierce, Fenner, & Smith, Inc.*, 228 Cal. Rptr. 345, 351 (Cal. Ct. App. 1986) ("While the customer agreement requires arbitration before the NYSE or NASD, that forum requirement is severable from the agreement to arbitrate customer controversies."). Thus, when "only one provision of the agreement is found to be unconscionable and that provision can easily be severed without affecting the remainder of the agreement," the agreement is not permeated with unconscionability and "the proper course" is to sever the offending provision. *See Dotson v. Amgen, Inc.*, 104 Cal. Rptr. 3d 341, 350 (2010); *Beltran*, 907 F.3d at 1263.

Here, the two APC Agreements are not permeated with unconscionability because only one provision, the arbitration provider clause in the 2017 APC Agreement, is of a high substantive unconscionability. As the *Beltran* court did, this Court "can easily sever the offending clause from the remainder of the agreement . . . [by] striking the phrase 'before an arbitration provider selected by AuPairCare.'" *Beltran*, 907 F.3d at 1263. In doing so, "the substantively unconscionable clause is removed without needing to rewrite any portion of the contract because both California and federal law provide a default method for appointing an arbitrator." *Id.*[13] As such, this Court has the authority to sever the one substantively unconscionable clause, the arbitration provider provision, from the 2017 APC Agreement. Thus,

---

[13] 9 U.S.C. § 5 states that if an arbitration agreement does not provide a method for selecting an arbitrator, "then upon the application of either party to the controversy the court shall designate and appoint an arbitrator," while Cal. Civ. Proc. Code § 1281.6 provides the following: "If the arbitration agreement does not provide a method for appointing an arbitrator, the parties to the agreement who seek arbitration and against whom arbitration is sought may agree on a method of appointing an arbitrator and that method shall be followed." Moreover, the 2018 APC Agreement's arbitration provider clause, which Plaintiff does not contest as unconscionable, states that "the arbitration shall be administered by a neutral arbitrator provided by American Arbitration Association ("AAA"), who shall be selected pursuant to AAA's Commercial Arbitration Rule." ECF No. 22-2 ¶ 86.

the Court finds that the 2017 and 2018 APC Agreements are valid and enforceable, and the elements required for the Court to compel arbitration are satisfied. The parties shall participate in arbitration.

***

Because Plaintiff Cuenca-Vidarte's claims against the APC Defendants are fully subject to arbitration and the agreement is itself valid, *see infra* § III.B1–3, her claims as to the APC Defendants are properly subject to dismissal. *See, e.g.*, *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709–10 (4th Cir. 2001) ("[D]ismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable.").

In sum, Plaintiff Cuenca-Vidarte's claims against APC Defendants, specifically Counts I–V of the First Amended Complaint, ECF No. 6, are dismissed as they are all properly subject to arbitration. Cucenca-Vidarte's claims against the Samuel Defendants remain as they are not subject to the arbitration agreement. Plaintiff Sandra Peters' claims, which are only against the Samuel Defendants, likewise remain. Moreover, the arbitration provider selection clause from the 2017 APC Agreement shall be severed, and Plaintiff Cuenca-Vidarte's claims against the APC Defendants are to proceed to arbitration using the entirety of the 2018 APC Agreement.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion to Compel Arbitration, ECF No. 22, is granted. A separate Order shall issue.

Date: <u>November 30, 2021</u>                                   /s/                                    
                                                              GEORGE J. HAZEL
                                                              United States District Judge